NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4942-13T1

LISA B. FREEDMAN and JEFFREY
C. ENDA,

       Plaintiffs-Respondents,

   v.

MURRAY N. SUFRIN and ELLEN L.
SUFRIN,

       Defendants-Appellants,

   and

PRUDENTIAL FOX & ROACH REALTORS,
VAL NUNNENKAMP, JOHN DRAGANI, JAMES
L. GARDNER, MARCIA RUBENSTEIN GARDNER,
SURETY TITLE CORPORATION, O.C.
EQUITIES, METRO DEVELOPMENT, LLC,
JOSEPH ZERBO and WAYNE ZERBO,

       Defendants.

> **APPROVED FOR PUBLICATION**
>
> **November 24, 2015**
>
> **APPELLATE DIVISION**

_____

Argued October 27, 2015 — Decided  November 24, 2015

Before Judges Fisher, Rothstadt and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Camden County, Docket No. C-114-11.

Joseph P. Grimes argued the cause for appellants (Grimes & Grimes, L.L.C., attorneys; Mr. Grimes, on the brief).

Hugh A. Keffer argued the cause for respondents (Fidelity National Law Group, attorneys; Mr. Keffer, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, defendants Murray and Ellen Sufrin argue that the judge erred in granting summary judgment in favor of their neighbors, plaintiffs Lisa B. Freedman and Jeffrey C. Enda, based on what defendants claim is an erroneous interpretation of a restrictive covenant which purports to limit, among other things, the removal of trees from plaintiffs' property. Because the covenant is unclear and ambiguous, we affirm.

The parties' cross-motions for summary judgment did not generate any material factual disputes. The record reveals that, on February 28, 2011, plaintiffs purchased a two-story, single-family residence on Covington Lane in Voorhees pursuant to a written contract that made no mention of a restrictive covenant. In 1996, however, a predecessor in title — O.C. Equities — purchased the property and obtained a deed from defendants that subjected the conveyance to the following restrictions:

> (1) No swimming pool shall be constructed on the property;

(2) The garage and driveway of said property [shall] be constructed on the side of the property which does not abut sellers['] property;

(3) The home to be constructed on the property [shall] be priced at a minimum of $275,000.00;

(4) Any home constructed on the property shall retain as many trees, shrubs, understory plant life as possible.

[5[1]] The above restrictions will continue until such time as the sellers, Murray N. Sufrin and Ellen Sufrin, reside at [the abutting property].

[6] Any transfer of property by sellers, Murray N. Sufrin and Ellen Sufrin, will void the restrictions.

In 1999, O.C. Equities sold the property to Metro Development, which promptly sold the property to James and Marcia Gardner, who later sold it to plaintiffs. Although the covenants in question were not memorialized in these later conveyances, we assume for present purposes that plaintiffs had actual knowledge of the restrictions in O.C. Equities' deed.[2]

Once plaintiffs took possession of this heavily-wooded property, they considered removing some trees, particularly

---

[1] We have inserted numbers for the last two unnumbered paragraphs only for ease of reference later in this opinion.

[2] We note that the trial judge presumed plaintiffs did not have knowledge of the restrictions when they purchased the property. In our opinion, it makes no difference.

A-4942-13T1

those with exposed roots that they believed caused a tripping hazard for one of their children, who has what they describe as "a balance issue." Controversy arose when defendants observed a landscaper on plaintiffs' property marking trees for removal. After advising plaintiffs of the 1996 covenant, defendants demanded that plaintiffs provide a landscaping plan for their approval. Plaintiffs provided an arborist report and a landscaping plan; defendants rejected both.

Consequently, in August 2011, plaintiffs commenced this quiet-title action in the Chancery Division. The parties cross-moved for summary judgment and, for reasons set forth in an oral decision, the judge granted plaintiffs' motion.[3] In appealing, defendants argue that the test devised in Davidson Bros., Inc. v. D. Katz & Sons, Inc., 121 N.J. 196 (1990), for determining the enforceability of restrictive covenants on commercial property should be applied here,[4] and, also, that the judge erroneously

---

[3] An amended complaint joined prior property owners and realtors; all those claims were later disposed of, rendering the summary judgment in question a final and appealable order.

[4] We quickly dispense with defendants' initial contention — raised for the first time on appeal — that Davidson controls. That case involved the enforceability of a covenant that barred use of property for a commercial purpose, a circumstance not present here. In addition, we note that defendants concede the restrictions in question are not part of a neighborhood scheme that might require a different approach. See Caullett v.
(continued)

determined that the tree-removal and other restrictions were personal covenants that did not run with the land. We find all these arguments lacking in sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), and add only the following brief comments.

We reject defendants' contentions because the restrictions they would impose on their neighbors do not meet the strict construction standard imposed by the common law. As cogently described by then Judge (later Justice) Sullivan:

> Restrictions on the use to which land may be put are not favored in law because they impair alienability. They are always to be strictly construed, and courts will not aid one person to restrict another in the use of his land unless the right to restrict is made manifest and clear in the restrictive covenant.
>
> [Bruno v. Hanna, 63 N.J. Super. 282, 285 (App. Div. 1960).]

Although Bruno acknowledges this rule of strict construction "will not be applied to defeat the obvious purpose of a restriction[,] . . . the meaning of a restrictive covenant will not be extended by implication and all doubts and ambiguities must be resolved in favor of the owner's unrestricted use of the land." Id. at 287. This standard remains unchanged. See

(continued)
Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 119 (App. Div. 1961).

Berger v. State, 71 N.J. 206, 215 (1976); Cooper River Plaza E., LLC v. The Briad Grp., 359 N.J. Super. 518, 526 (App. Div. 2003); Steiger v. Lenoci, 352 N.J. Super. 90, 95 (App. Div. 2002). Accordingly, the existence of ambiguities does not preclude summary judgment, as would be the case when construing a contract; to the contrary, in light of the test described in Bruno, ambiguities invite summary judgment in this context.

With these principles in mind, we turn to the particular language employed to determine whether the alleged ban on tree removal was "made manifest and clear." Bruno, supra, 63 N.J. Super. at 285. We conclude that the covenant does not say what defendants now argue it says, and that the covenant is, at best, unclear.

An examination of the fifth paragraph, in fact, demonstrates that its neighboring provisions long ago lost any vitality once likely intended. Defendants argue that this fifth paragraph should be understood as declaring that the first four provisions are to apply "so long as" defendants reside next door; in fact, the paragraph expresses the opposite: "The above restrictions will continue until such time as the sellers, Murray N. Sufrin and Ellen Sufrin, reside at [the abutting property]" (emphasis added). Because the most common meaning of "until" is "up to the time of," the only logical meaning to be

attributed to this sentence is that the entire covenant became irrelevant once defendants took up residence next door. Unless we are to apply the standard of interpretation famously employed by Humpty Dumpty,[5] defendants' contention that "until such time" should be translated as "so long as" must be rejected.[6]

The entirety of the restrictive covenant suggests its application only to O.C. Equities, the developer of the property, and supports the trial judge's determination that the covenant was personal to O.C. Equities and would not apply to future owners.  Numerous terms reveal this intent to limit application to the builder-owner. The second paragraph mandated "construct[ion]" of the garage and driveway to the non-abutting side of the property; the third paragraph imposed a dollar value

---

[5] "'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less.' 'The question is,' said Alice, 'whether you can make words mean so many different things.' 'The question is,' said Humpty Dumpty, 'which is to be master — that's all.'"  Lewis Carroll, Through the Looking Glass, ch. VI (1871).

[6] Although the record is silent as to when defendants first resided in the neighboring home, it seems likely they actually were present when they imposed the restrictive covenant on O.C. Equities. That particular circumstance, however, would not suggest the wording of the fourth paragraph should be construed in some way other than the manner required by the common, everyday meaning of the words actually employed. That circumstance would only suggest that defendant Murray Sufrin — an attorney and drafter of the restrictions — did not convey his intentions with the clarity needed to bind O.C. Equities, let alone successors in title, who could not be charged with knowledge of the identities of the next door residents.

on "[t]he home to be constructed on the property"; the fourth paragraph — the provision directly implicated here — required the retention of "as many trees . . . as possible" for "[a]ny home constructed" on the property (emphasis added). Indeed, the language of the fourth paragraph — retain "as many trees . . . as possible" — cannot be logically understood as expressing anything more than O.C. Equities' stipulation to leave as many trees standing during the construction of the residence as it could. Viewing these restrictions as a whole, the only reasonable interpretation limits their application to the builder of the residence and not any future owners.

Upon completion of construction, the language of the covenant lost any sensible meaning for subsequent owners. For example, even when interpreted as defendants urge, the covenant does not purport to prohibit all tree removal; it expresses only that "as many trees . . . as possible" be retained. What does that mean? Does it mean that plaintiffs must retain as many trees as defendants might possibly require for whatever unexpressed purpose they might have had in mind? Or as many trees as may be possibly retained, but perhaps giving the owners some ability to remove trees in order to keep the premises safe for occupants and visitors? These questions are unanswerable because the covenant provides no clue as to what defendants were

attempting to preserve by extracting O.C. Equities' agreement to retain as many trees as possible when constructing the residence. The common law's standard of strict construction bars looking elsewhere[7] for a clear understanding.[8]

Because the restrictive covenant: has no application once defendants occupied the neighboring property, an event that long ago occurred; can only reasonably be understood as binding O.C. Equities, an earlier owner that constructed the residence; and has no rational application to the current owners' use and enjoyment of their property, we affirm the summary judgment that declared the restriction null and void and henceforth unenforceable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Defendants allude to Joyce Kilmer's Trees (1913) for guidance. Trees may be worthy of our admiration and wonder but does that mean all trees must be left standing until they fall of their own accord?

[8] Even if the fourth paragraph imposed some sort of aesthetic guideline for the purpose of preserving a wooded view for defendants, no court could safely enforce that standard. See Ginsburg v. White, 139 N.J. Eq. 271, 273-74 (E. & A. 1947) (recognizing that "[a] contract which is incomplete, uncertain or indefinite in its material terms will not be specifically enforced in equity").